UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

BONITA BROWNLOW                                                    PLAINTIFF

v.                                             CIVIL ACTION NO. 3:05CV-414-R

GENERAL MOTORS CORPORATION, et al.                       DEFENDANTS

## ORDER

This matter is before the District Court on the objections of Defendant General Motors Corporation (GM).  GM objects to a discovery order of the Magistrate Judge entered on November 14, 2006 (DN 60).  The challenged order resolved a series of disputes over the scope of discovery in this product liability action.  The lawsuit arises out of an automobile rollover accident that rendered the teenage Plaintiff a quadriplegic (DN 48, 55).  GM has filed two objections to Magistrate's order (DN 63, 64).  Plaintiff has responded (DN 68, 72).  GM has replied (DN 78, 79).  Plaintiff has filed a surreply (DN 90) and GM a supplement (DN 92). Accordingly, the matter is ripe for consideration.

### *GM's Objections.*

GM has filed extensive objections to the Magistrate's order (DN 63, 64). Essentially GM argues that the Magistrate abused his discretion when he failed to place reasonable limits on the scope of discovery, contrary to controlling Sixth Circuit case law. The result, according to GM, is that the Magistrate Judge unfairly burdened GM with the production of information and documents involving products that are not substantially similar to the second generation U-Van involved in the accident.  Not only did the Magistrate require GM to provide information on vehicles unrelated to the 2003 Montana van at issue, GM contends he also clearly

erred in entering an order that required GM to produce documents spanning 40 years.  In doing so, GM complains that the Magistrate Judge abused his discretion by giving more weight to a consumer magazine than to GM's own engineers, Stuart Harbin and Jack Yee, who actually designed the U-Van and provided an affidavit that establishes that the three generations of U-Vans are not substantially similar.  GM also argues that the Magistrate Judge abused his discretion when he ordered GM to produce documents concerning all rollover accidents that involved any GM vehicle at the GM Proving Grounds, beyond those vehicles with a body structure similar to the 2003 Montana.

GM also argues in its initial objections that the Magistrate Judge erroneously concluded that documents it produced to Plaintiff's counsel in two unrelated rollover lawsuits, Graham v. GM and Cangelosi v. GM, should be deemed produced in the present lawsuit based on the mistaken belief that the other lawsuits involved the identical model of GM van now at issue.  This error was compounded, so says GM, because at the time the Magistrate Judge entered his order, neither he nor GM knew the contents of the documents.

GM argues next that the Magistrate Judge abused his discretion when he ordered production of documents regarding alternative designs for the roof of the 2003 Montana van, both before and after the accident.  The Magistrate Judge also supposedly misinterpreted the complaint to include a claim for defective stability and then proceeded to capriciously enter a sharing Confidentiality Protective Order (CPO) that is unreasonably broad and permits Plaintiff's counsel to divulge otherwise protected documents without notice to GM.

GM has separately objected to the portion of the Magistrate's order that requires production of computer aided design (CAD) files and finite element computer modeling

technology (DN 64).  GM argues first that it has no relevant finite element computer modeling

technology to produce.  It specifically claims that the roof strength analysis computer models

used in the development of the first, second or third generation of U-Vans no longer exist.

Additionally, GM maintains that its CAD files and finite element computer modeling technology

involve protected property that has independent economic value and is protected by GM from

disclosure.  Because the Plaintiff allegedly failed to show that the requested computer modeling

technology and CAD files are not only relevant, but are necessary for her to prove her case, the

Magistrate Judge supposedly erred in ordering the production of this highly sensitive proprietary

information without performing the necessary balancing analysis.  Absent revision of the

Magistrate Judge's order, GM concludes that it will suffer permanent economic damage through

the loss of its cutting edge computer modeling technology, which once publicly disclosed cannot

be protected.

## *Standard of Review*

There is no serious dispute over the standard of review applied to nondispositive

orders of the Magistrate Judge.  The parties' motions were referred to the Magistrate for

consideration pursuant to 28 U.S.C. § 636, which Congress enacted specifically to relieve the

burden of the federal courts by permitting assignment of certain duties to magistrate judges.

Gomez v. United States, 490 U.S. 858, 869-70 (1989) (reviewing the legislative history of §

636).  Section 636(b) identifies the powers that may be assigned to magistrates by the district

court.  It also sets out the applicable standard of review for objections to the ruling of a

Magistrate Judge on such assigned matters.  See 28 U.S.C. § 636(b) ("A judge of the court may

reconsider any pretrial matter under subparagraph (A) [relating to nondispositive orders] where it has been shown that the magistrate's order is clearly erroneous or contrary to law.").

In <u>United States v. Curtis</u>, 237 F.3d 598, 603 (6th Cir. 2001), the Sixth Circuit explained:

> Thus, § 636(b) creates two different standards of review for district courts when a magistrate court's finding is challenged in district court.  A district court shall apply a 'clearly erroneous or contrary to law' standard of review for the 'nondispositive, preliminary measures of § 636(b)(1)(A).'  <u>United States v. Raddatz</u>, 447 U.S. 667, 673 (1980).  Conversely, 'dispositive motions' accepted from § 636(b)(1)(A), such as motions for summary judgment or for the suppression of evidence, are governed by the *de novo* standard.  <u>Id</u>. at 674.

<u>Curtis</u>, 237 F.3d at 603.

The language of Rule 72 of the Federal Rules of Civil Procedure "has implemented this statutory provision."  <u>Callier v. Gray</u>, 167 F.3d 977, 980 (6th Cir. 1999).  The relevant portion of Rule 72 provides in subsection (a) that this Court shall consider objections to a magistrate judge's order on a nondispositive matter and "shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law."  Fed.R.Civ.P. 72(1).

Our circuit holds that this standard of review is a limited one.  <u>See</u> <u>Massey v. City of Ferndale</u>, 7 F.3d 506, 509 (6th Cir. 1993) ("When a magistrate judge determines a non-excepted, pending pretrial matter, the district court has the authority to 'reconsider' the determination, but under a limited standard of review.") (citing 28 U.S.C. § 636(b)(1)(A)).  <u>See gen.</u> Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, <u>Federal Practice & Procedure</u>, § 3068 (West 2007) (Rule 72 is designed to implement the legislative mandate of Section

636(b)(1), the provision in the 1976 amendments to the Act that clarified and expanded the authority that a district court may delegate to a magistrate judge in pretrial matters.).

Several decisions from the courts of this circuit discuss the "clearly erroneous" and the "contrary to law" standard found in § 636(b)(1)(A) and Rule 72(a).  In <u>Tri-Star Airlines, Inc. v. Willis Careen Corp. of Los Angeles</u>, 75 F.Supp.2d 835, 839 (W.D. Tenn. 1999), our sister District Court for the Western District of Tennessee explained:

> A judicial finding is deemed to be clearly erroneous when it leaves the reviewing court with 'a definite and firm conviction that a mistake has been committed.'  <u>Heights Community Congress v. Hilltop Realty, Inc.</u>, 774 F.2d 135, 140 (6th Cir. 1985).  Under the clearly erroneous standard, a court reviewing a magistrate judge's order should not ask whether the finding is the best or the only conclusion that can be drawn from the evidence.  Further, this standard does not permit the reviewing court to substitute its own conclusion for that of the magistrate judge.  Rather, the clearly erroneous standard only requires the reviewing court to determine if there is any evidence to support the magistrate judge's finding and that the finding was reasonable.  <u>Id</u>.

<u>Id</u>.  <u>See also</u> <u>In re Search Warrants Issued Aug. 29, 1994</u>, 889 F. Supp. 296, 298 (S.D. Ohio 1995) ("Review under Rule 72(a) provides 'considerable deference to the determination of the magistrates.'  7 <u>Moore's Federal Practice</u>, ¶ 72.03 [7.-3]. A finding is clearly erroneous only when the reviewing court is left with a definite and firm conviction that a mistake has been committed.") (citing <u>Heights Community Congress</u>, <u>supra</u>).

Numerous federal courts have commented on the discretion afforded to magistrate judges under Rule 72(a) when resolving the discovery disputes.  <u>See</u> <u>e.g.</u>, <u>Carmona v. Wright</u>, 233 F.R.D. 270, 276 (N.D. N.Y. 2006) ("Because the nondispositive review standard is highly deferential, magistrate judges have broad discretion to regulate nondispositive matters, and reversal is warranted only if that discretion is abused. Although legal authority may support an

5

objection, the critical inquiry is whether there is legal authority that supports the magistrate's conclusion, in which there is no abuse of discretion.  That reasonable minds may differ on the wisdom of a legal conclusion does not mean it is clearly erroneous or contrary to law."); Neighborhood Development Collaborative v. Murphy, 233 F.R.D. Md. 2005 ("Courts have consistently found discovery motions to be non-dispositive within the meaning of Rule 72(a).  A district court owes substantial deference to a magistrate judge in considering a magistrate judge's ruling on a non-dispositive motion."); American Rock Salt Co., LLC v. Norfolk Southern Corp., 371 F.Supp.2d 358, 360 (W.D. N.Y. 2005) ("The party seeking to reverse a magistrate judge's ruling concerning discovery bears a heavy burden, in part because the magistrate judge is afforded broad discretion in these matter."); Marks v. Struble, 347 F.Supp.2d 136, 149 (D.N.J. 2004) ("A magistrate judge is accorded wide discretion in addressing non-dispositive motions. A court may not reverse, modify, or vacate a magistrate judge's order adjudicating a non-dispositive motion unless that order is clearly erroneous or contrary to law.  This is so even if we would have decided the issue differently."); Estates of Ungar and Ungar, ex rel. Strichman v. Palestinian Authority, 325 F.Supp.2d 15, 25 (D.R.I. 2004) ("In conducting ... [its] review, the district court must refrain from second guessing the magistrate judge's pre-trial discovery rulings."); EEOC v. First Wireless Group, Inc., 225 F.R.D. 404, 405 (E.D. N.Y. 2004) ("A magistrate judge's resolution of discovery disputes deserves substantial deference and is overruled only if there is an abuse of discretion."); Lithuanian Commerce Corp., Ltd. v. Sara Lee Hoisery, 177 F.R.D. 205, 214 (D.N.J. 1997) (The deferential standard of review under Rule 72(a) is "especially appropriate where the magistrate judge has managed [a] ... case from the outset and developed a thorough knowledge of the proceedings.").

A different standard applies when the district court examines the legal conclusions of a magistrate judge.  The legal conclusions of a magistrate judge "are reviewed under the plenary 'contrary to law' standard."  <u>Haworth, Inc. v. Herman Miller, Inc.</u>, 162 F.R.D. 289, 291 (W.D. Mich. 1995) (citing <u>Gandee v. Glaser</u>, 785 F.Supp. 684, 686 (S.D. Ohio 1992), <u>affirmed</u>, 19 F.3d 1432 (6th Cir. 1994)).  Legal conclusions of the magistrate which contradict or ignore applicable precepts of law found in the Constitution, statutes or case precedent may be overturned.  <u>Gandee</u>, 785 F.Supp. at 686 (citing <u>Adolph Coors Co. v. Wallace</u>, 570 F.Supp. 202, 205 (N.D. Cal. 1983)).  Accordingly, the district court will exercise its independent judgment with respect to the legal conclusions of a magistrate judge on review pursuant to Fed.R.Civ.P. 72(a).  <u>Id</u>. (citing <u>Hawkins v. Ohio Bell Telephone Co.</u>, 93 F.R.D. 547, 551 (S.D. Ohio 1982), <u>affirmed</u>, 785 F.2d 308 (6th Cir. 1986).  <u>See also</u> <u>In re Natural Gas Commodities Litigation</u>, 232 F.R.D. 208, 211 (S.D.N.Y. 2005) (An order may be deemed 'contrary to law' when it 'fails to apply or misapplies relevant statutes, case law, or rules of procedure.'") (citing <u>Catskill Dev., LLC v. Park Place Entertainment Corp.</u>, 206 F.R.D. 78, 86 (S.D. N.Y. 2002)).

### *GM's Initial Objections.*

The District Court begins with the first set of objections filed by GM (DN 63).  The Court sees little indication that the Magistrate Judge abused his discretion "by failing to rely on the controlling law in the Sixth Circuit."  (DN 63, p. 4).  In fact, to the extent that GM cites the decisions of the Sixth Circuit, they reflect merely that the scope of discovery falls within the broad discretion of the trial court.  <u>Lewis v. KCB Business Services, Inc.</u>, 135 F.3d 389, 402 (6th Cir. 1998).  <u>See also</u> <u>Bush v. Dictaphone Corp.</u>, 161 F.3d 363, 367 (6th Cir. 1998) ("'The scope

of discovery is, of course, within the broad discretion of the trial court....'") (quoting <u>Lewis</u>, 135 F.3d at 402). This proposition is hardly novel. Certainly, the Magistrate Judge does not appear to have overlooked this principle; nor does his order misstate the controlling principles as they relate to relevancy under Rule 26(b) of the Federal Rules of Civil Procedure. That he has chosen in his order to cite decisions from various district courts is hardly cause for concern in the eyes of this Court.

More to the point is the suggestion by GM that perhaps the Magistrate Judge has improperly ordered discovery related to products that are not substantially similar to the second generation U-Van, contrary to law. GM cites two decisions, <u>Prashker v. Beech Aircraft Corp.</u>, 258 F.2d 602 (3rd Cir. 1958) and <u>Butkowski v. GM Corp.</u>, 497 F.2d 1158 (2nd Cir. 1974). The problem with these cases is that the first, <u>Prashker</u>, focused on the admissibility at trial of evidence relating to other similar incidents involving the crash of a small airplane. The Third Circuit in <u>Prashker</u> affirmed the discretion of the trial court to exclude evidence of another airplane crash that occurred under conditions not similar to the crash that was the subject of the lawsuit.

The <u>Butkowski</u> decision, in contrast, does involve the denial of discovery. It is limited in its precedential value, however, because of its procedural setting. <u>Butkowski</u> involved an untimely request for discovery made three and a half years after the complaint was filed, and after the case had been set for trial. <u>Id</u>. at 1159. Further, the discovery requests involved in <u>Butkowski</u> related to an alleged defect which caused the idler arm in the subject automobile to separate from the steering assembly. The plaintiff in <u>Butkowski</u> never alleged such a defect as his theory of liability to explain the automobile accident involved. <u>Id</u>. The Court therefore

8

concludes that neither Prashker nor Butkowski undermines the Magistrate Judge's extensive discussion of substantial similarity.

The Magistrate's reliance on Bowman v. GM, 64 F.R.D. 62, 67-68 (E.D. Pa. 1974) is persuasive in the context of the present lawsuit.  The Court will not restate the circumstances nor the holding of Bowman.  The Magistrate Judge aptly described both. Bowman appears to this Court to put to rest any notion that the Magistrate Judge was bound to uncritically endorse the conclusions in the affidavits of Harvin or Yee.  The Court does not agree with GM that the Magistrate Judge ignored any material portions of either man's affidavit.  The Magistrate Judge instead chose to put more weight on a neutral publication rather than on affidavits provided by individuals with a vital interest in the financial health of their employer.

Further, even were the Court to accord more weight to the affidavits than the consumer publication, such deference would not render information about the first and third generations of the U-Van undiscoverable.  Information concerning prior models of GM U-Vans would remain relevant to issues of defect, notice of defect and GM's possible failure to respond to an alleged defect; whereas, discovery of information related to later models would remain relevant to reasonable alternative designs and their performance.  In sum, the Court cannot say that the Magistrate Judge clearly erred or acted contrary to law in the manner in which he approached the question of substantial similarity.

The Court reaches the same conclusion with respect to that portion of the Magistrate's order that requires the disclosure of rollover accidents that occurred at the GM Proving Ground.  While the Magistrate Judge's order does include vehicles beyond the U-Van at issue, his exercise of discretion appears sound to the Court.  Plaintiff is entitled to discover

whether GM reinforced the roofs of vehicles involved in rollover accidents; and, if so, whether such vehicles with reinforced roofs suffered minimal roof crush as a result.  Plaintiff is entitled to anticipate GM's litigation position that additional roof strength is unrelated to improving passenger safety in its vehicles.  To the extent that information concerning vehicle rollovers at GM's Proving Ground can be argued to contradict such a position, the Magistrate Judge rightly considered such information to be discoverable at least.

As for the documents previously obtained by Plaintiff's counsel in <u>Graham v. GM</u>, Civil Action No. CV-2002-714 and <u>Cangelosi v. GM</u>, Civil Action No. CV-03-188, some question does exist as to whether the Magistrate Judge misunderstood the nature of the GM vehicles involved in these two Alabama rollover cases.  Neither party disputes that these cases did *not* involve the same model of GM Montana van now at issue.  Apparently, the confusion resulted from a possible misreading of a hypothetical argument raised by GM in its motion papers.  A better understanding of the error can be found at p. 20 of the Magistrate Judge's order whereat he restates GM's argument concerning documents previously produced in the two lawsuits.

The Magistrate in restating GM's position indicates that GM's view is that even if the documents were ordered to be produced in a prior GM automobile rollover case, they would not automatically be discoverable "herein 'even if it did involve the same vehicle.'"  (DN 60, p. 20) (citing DN 38, p. 18).  In other words, GM apparently did not state that the two Alabama lawsuits actively involved the same vehicle.  Instead, it argued, in the abstract, that had the two lawsuits involved the same vehicle, the documents would not automatically be discoverable in the present litigation.

The hypothetical apparently was read to be a concession that the two lawsuits involved the same vehicle.  The record certainly gives no indication of any deliberate misstatement by counsel for either party concerning the nature of the automobiles involved in the Alabama lawsuits.  Instead, the matter simply seems to be an understandable misreading of a hypothetical.  The Court ascribes no underhanded conduct to any counsel in this regard.  All that occurred appears to have been a relatively minor mistake.

The Court has examined the index of the previously produced documents compiled by the Plaintiff, which is attached to her surreply as Exhibit 2 (DN 90, Exh. 2).  The indexed documents include:  149 documents that provide a history of the federal static testing standard, the FMVSS 216 standard; 27 documents involving the Project No. 2140 inverted drop test versus static roof crush test related to the GM Proving Group report dated Jan. 7, 1966; 26 GM documents related to the inverted drop test versus static roof crush test; and, 27 documents related to GM's early drop test and group level ramp rollover video.  All of the indexed documents are relevant to the Plaintiff's theories about the history of the current static roof crush test contained in FMVSS 216 and GM's past involvement with other, allegedly more realistic, roof testing methods prior to the adoption of the current federal standard.

As the Magistrate noted, Plaintiff's theory is that GM actively worked to influence the adoption of the FMVSS 216 test by supposedly misrepresenting its effectiveness when GM was aware that the test was inadequate.  The indexed documents all relate to this particular theory.  They are not specific to any particular model of GM automobile.  In fact, the documents for the most part, predate the manufacture of the second generation of GM U-Van.  Accordingly, any misunderstanding concerning the model of GM automobile involved in the

11

Alabama lawsuits was absolutely harmless.  The Magistrate Judge's reliance on Wauchop v.

Domino's Pizza, Inc., 130 F.R.D. 539, 549 (N.D. Ind. 1991) and United States v. ATCT Co., 86

F.R.D. 603, 650-51 (D.D.C. 1980) was not clear error, nor did he abuse his discretion when he

ordered that the subject documents be deemed produced.

        The Court likewise supports the Magistrate Judge's resolution of the alternative

design discovery issue.  Information relating to the feasibility and effectiveness of alternative

designs, and GM's knowledge of potentially safer designs, is highly relevant and thus

discoverable.  See Cardenas v. Dorel Juvenile Group, Inc., 230 F.R.D. 611, 614-16 (D.Kan.

2005) (granting plaintiff's motion to compel the production of information concerning the

defendant manufacturer's European version of a child car seat in a lawsuit involving an

American child car seat manufactured by the same parent corporation, where the challenged

discovery was relevant to the feasibility of a safer, alternative design).

        Plaintiff's theory in this case is that, despite GM's claims to the contrary,

dynamic automobile roof testing, such as rollover testing and drop testing, is routinely used in

the European brands of GM products like Saab and Opal.  Plaintiff reasons that GM's use of

such testing refutes its claims that it is unscientific and unreliable.  Discovery of alternative

design information relating to subsequent designs, such as the third generation of GM U-Van, is

likewise relevant under Rule 26(b).  As the Magistrate correctly points out, the general rule of

exclusion under Fed.R.Evid. 407 does not apply when evidence of subsequent remedial measures

is offered to prove the feasibility of precautionary measures.  Fed.R.Evid. 407; Culligan v.

Yamaha Motor Corp., USA, 110 F.R.D. 122, 124-25 (S.D. N.Y. 1986) (Information about post-

manufacture testing was clearly relevant and discoverable in ATV rollover case even though it

dealt with models other than the ATV model at issue in order to show feasibility of alternative designs.).  Once again, the Court finds no clear error of law in the resolution by the Magistrate Judge of this issue.

The Magistrate Judge also did not abuse his discretion in allowing discovery concerning electronic stability control (ESC), despite the absence of specific reference to ESC in the complaint.  The Magistrate Judge properly relied upon the liberal notice pleading standard of Rule 8 in resolving this matter.  As the Sixth Circuit has held, "A complaint need not set down in detail all the particulars of a plaintiff's claim against a defendant."  Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976) (citing Rule 8(a)(2)).  Instead, "All a complaint need do is afford the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  Id. (citing Conley v. Gibson, 355 U.S. 41, 47 (1957)).  See also Oil, Chemical and Atomic Workers' Int'l Union, AFL–CIO v. Delta Refining Co., 277 F.2d 694, 697 (6th Cir. 1960) ("Under the notice system of pleadings established by the Rules of Civil Procedure ... the distinction between pleading 'facts' and 'conclusions' is no longer significant."); Sage Int'l Ltd. v. Cadillac Gage Co., 507 F. Supp. 939, 948 (E.D.Mich. 1981) (In considering a motion that challenges the adequacy of a claim raised in the complaint, "the Court properly considers supporting allegations made by the nonmoving party through reference to discovery, so long as the allegation in the complaint is sufficient to state a cause of action and to put the defendant on notice of that against which it much defend.").

Examination of the complaint, coupled with the discovery at issue, convinces the Court that Plaintiff has adequately alleged that the 2003 Montana was defective and unreasonably dangerous due to its lack of ESC.  To hold otherwise, and to bar discovery merely

13

because ESC was not specifically referred to by name in the complaint, would automatically preclude injured Plaintiffs from refining their theory of the nature of the alleged defects in product liability actions; and indeed, would preclude recovery itself except for those defects specifically pled in the complaint at the outset of the litigation.  That is not the law, and the Magistrate Judge so recognized.

The final matter raised in GM's initial objection involves the language and scope of the sharing confidentiality protective order (CPO).  GM maintains that the scope of the order is overly broad and that it fails to provide adequate protection to GM.  GM asks that the Court limit the scope of the sharing CPO to permit GM to place an obvious watermark on protected documents and to limit the scope of sharing to only the second generation of U-Van.  GM further asks for pre-distribution notice from Plaintiff's counsel before any documents subject to the order are shared.

The Court has considered each of these requests in the context of the language of the present sharing CPO.  As Plaintiff points out, the language of the CPO is in large part GM's own language.  It is GM that included no provision requiring watermarks or pre-notification in the CPO.  Further, the absence of a watermark does not prevent GM from otherwise indicating on the document that it is confidential.  Likewise, the CPO at issue does appear to require that the identity of all persons who receive documents under its sharing provisions be disclosed.  GM therefore is not left in the dark without knowledge of who has received the subject documents.  As for the scope of similar cases for the purpose of the order, the Court has already adopted the definition of substantial similarity relied on by the Magistrate Judge in his prior order.  Accordingly, the Court finds no basis on which to amend the sharing CPO.

14

### *CAD Files and Finite Element Computer Modeling*

The Court concludes its review with the objections filed by GM to that portion of the Magistrate's order of November 14, 2006, that requires GM to produce its CAD files and its finite element computer modeling technology.  GM maintains that these items are not simply electronically stored data.  They are instead trade secrets and confidential business information that has independent economic value and is highly protected by GM.  Such proprietary information may not be disclosed according to GM unless Plaintiff establishes both the relevancy and the absolute necessity of such discovery to maintain her claims (DN 64).

GM also advises the Court and counsel that it has searched diligently for the requested finite element computer modeling technology and CAD files and has been unable to locate any such files to date.  In support of this assertion, GM has supplied the affidavit and supplemental affidavit of its engineer, Stuart Harvin (DN 64, Harvin Aff.).  Apparently, such computer models are not retained once a GM vehicle goes into physical production.  Accordingly, after diligent search, GM advises that it has no such information to produce.

Plaintiff responds that the CAD files and computer modeling technology are absolutely necessary to her ability to analyze the U-Van design in order to simulate and test the effectiveness of various alternative designs "without having to go to the burden and huge expense of purchasing and then physically crash testing real Montana vans equipped with such designs..."  (DN 72, p. 4).  Plaintiff additionally explains that while the computer models may be "snapshots in time" of pre-production designs, until such electronic discovery is disclosed, Plaintiff will have no ability to know what designs GM may have considered and rejected as part of the design process.  Indeed, Plaintiff maintains that this type of electronic discovery is now

15

the primary evidence in a modern product liability case where automotive testing is routinely conducted through computer modeling.

Finally, Plaintiff challenges the notion that GM's computer modeling is proprietary and secret given that GM, along with most major automobile manufacturers, purchases computer modeling software known as "HyperMesh" from the third-party supplier Altair.  Altair supplies HyperMesh computer modeling software to 3,000 clients worldwide including BMW, DaimlerChrylser, Ford, Honda, Hyundai, Mazda, Nissan and Toyota.  Plaintiff reasons that with all of these automobile manufacturers using the HyperMesh computer technology, it is highly likely that they share a similar knowledge of the modeling technology, which refutes any notion that GM's finite element computer modeling is a trade secret.

The Court agrees with GM that if the requested CAD files and finite element computer modeling technology are proprietary trade secrets, then additional factors such as necessity must be considered prior to entering an order for the disclosure of such information.  A trade secret is defined by the extent to which its owner protects his interest from disclosure to others and if an individual discloses a trade secret to those who have no obligation to protect its confidentiality, or otherwise makes such secret public, his property right is forever extinguished. See Ruckelshaus v. Monsanto Co., U.S. 986 (1984); Scharmer v. Carollton Manuf. Co., 525 F.2d 95 (6th Cir. 1975) (A property right in a trade secret ceases to exist after the secret has become public property through general disclosure.).  Consequently, the Court will not order the disclosure of such trade secret until and unless it is established that such information is both relevant and necessary to the party seeking discovery.  See Triangle, Inc. & Color Co., Inc. v. Sherwin-Williams Co., 61 F.R.D. 634, 636 (N.D. Ill. 1974).

Here, examination of the Magistrate Judge's order suggests to the Court that the Magistrate Judge may have inadvertently blended the nature of the electronic computer information sought.  In his order, the Magistrate Judge refers to "finite element analysis CAD files."  (DN 60, p. 23).  The order continues to add that the files are sought so that the Plaintiff may test the results of GM's computer-aided design.  (Id.).  Apparently, the Magistrate Judge possibly believed that the information sought consisted merely of electronic data files rather than the computer modeling technology itself.  The result is a possible failure to fully consider the trade secret implications of the requested information, along with the heightened standard for its disclosure.

The challenged order contains no reference to any judicial decisions involving the potential disclosure of trade secrets via discovery, although it does discuss protecting the "privacy concerns" of GM.  Because the Magistrate Judge may well have failed to apply the appropriate standard for discovery of trade secrets, in view of the affidavit of Stuart Harvin that establishes the proprietary nature of the disputed computer modeling technology, the Court shall set aside that portion of the Magistrate Judge's order that requires the production of the disputed CAD files and finite element computer modeling technology.[1]

The Court need not presently determine whether the finite element computer modeling technology is sufficiently relevant and necessary to require its limited production for

---

[1] The Court has considered the involvement of Altair and its "HyperMesh" product.  It appears to the Court that "HyperMesh" is a software tool used to build a customized computer model.  While "HyperMesh" certainly cannot be considered a trade secret, the computer model that GM's engineers produce through the use of "HyperMesh" may well have such status if it has independent economic value and is not disclosed or otherwise generally known to the public.  One might analogize the situation to a chisel used by a sculptor.  The chisel itself certainly is not unique in any sense, but he sculpture produced through its use is.

the purpose of the present lawsuit.  The affidavit and supplemental affidavit of GM's engineer makes clear that no such requested computer files or technology remain available for production. Thus, while a question does exist as to whether the proper standard was applied, the matter  at this point, at least appears to the Court to be **MOOT**.

The best course under the particular circumstances simply is to set aside the Magistrate's discovery order to this extent, and to this extent alone, with the understanding that should any such CAD files or finite element computer modeling technology be uncovered in the future course of discovery, the issue will be revisited by the District Court so that a complete analysis under trade secret law can be made.  In all other respects, the District Court **AFFIRMS** the order of the Magistrate Judge, which is neither clearly erroneous nor contrary to law.  Only that portion of the Magistrate's order that requires the production of the CAD files and finite element modeling technology is set aside by this order, subject to being revisited should any such electronic information be uncovered at a future date during the period for production of discovery.

Copies to Counsel of Record